UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
PERRY MILLIMAN, individually and as
Husband and Wife, and ROBIN MILLIMAN,
individually and as Husband and Wife,

                       Plaintiffs,              No. 1:06-CV-1443 (DNH) (RFT)

       v.

MITSUBISHI CATERPILLAR FORKLIFT
AMERICA, INC.

                       Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                     OF COUNSEL:

CAPASSO, MASSARONI, LLP        JOHN R. SEEBOLD, ESQ.
Attorney for Plaintiffs
P.O. Box 1088
215 State Street
Schenectady, New York 12301-1088

BRYAN, CAVE, LLP               CHRISTOPHER D. BAUCOM, ESQ.
Attorneys for Defendant Mitsubishi Caterpillar   DANIEL J. CARPENTER, ESQ.
Forklift America, Inc.
211 North Broadway, Suite 3600
St. Louis, Missouri 63102

STRONGIN, ROTHMAN & ABRAMS, LLP    HOWARD F. STRONGIN, ESQ.
Attorneys for Defendant Mitsubishi Caterpillar  MARTIN M. ADLER, ESQ.
Forklift American, Inc.
5 Hanover Square, 4th Floor
New York, New York 10004

DAVID N. HURD
United States District Judge

**TABLE OF CONTENTS**

I. INTRODUCTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 3 -

II. BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 4 -

III. DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 7 -

    A. Defendant's Motion to Disqualify Dr. Engin as an Expert Witness.. . . . . . . - 7 -

    B. Defendant's Motion to Bar Dr. Engin's Proffered Testimony. . . . . . . . . . . . - 9 -

        1. The Safety Tether and Harness. . . . . . . . . . . . . . . . . . . . . . . . . . . - 13 -

        2. The Interlock Device. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 15 -

        3. The Segmented Guard Rail. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 16 -

        4. The Cost of Dr. Engin's Alternative Design.. . . . . . . . . . . . . . . . . . - 17 -

    C. Defendant's Motion for Summary Judgment. . . . . . . . . . . . . . . . . . . . . . - 18 -

        1. Alteration of the Orderpicker After Delivery.. . . . . . . . . . . . . . . . . . - 19 -

            a. Delivery of the Orderpicker. . . . . . . . . . . . . . . . . . . . . . . . - 19 -

            b. Substantial Alteration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 21 -

        2. Unforeseeable Misuse. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 22 -

        3. Evidence of the Proximate Cause of Mr. Milliman's Injuries. . . . . . . . - 24 -

        4. Failure to Warn. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 25 -

            a. Open and Obvious Dangers. . . . . . . . . . . . . . . . . . . . . . . . - 26 -

        5. Preemption by Federal Standards. . . . . . . . . . . . . . . . . . . . . . . . . - 27 -

            a. Field Preemption.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 27 -

            b. Conflict Preemption. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 29 -

        6. Inadmissibility of Dr. Engin's Opinions. . . . . . . . . . . . . . . . . . . . . . - 30 -

IV. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 30 -

**MEMORANDUM-DECISION and ORDER**

## I. INTRODUCTION

Plaintiffs Perry Milliman and his wife Robin Milliman (hereinafter "plaintiffs") bring a product liability action against defendants Mitsubishi Caterpillar Forklift America, Inc. (hereinafter "Mitsubishi" or "defendant") and Citicorp Del-Lease, Inc.[1]  Plaintiffs assert five causes of action in their complaint against both defendants.  First, plaintiff alleges manufacturing and design defects arising from defendants' negligence.  Second, plaintiff alleges the defendants are strictly liable for manufacturing and design defects.  Third, plaintiffs assert a breach of warranty claim.  Fourth, plaintiffs allege defendants failed to adequately warn of the dangers associated with its product.  Fifth, plaintiff Robin Milliman asserts a claim for loss of consortium relating to her husband's injury.

Defendant Mitsubishi moves to strike the expert designation of plaintiffs' witness, Dr. Ali Engin, or alternatively, to preclude plaintiffs' expert from testifying pursuant to Federal Rule of Evidence 702 and the legal standard delineated in Daubert v. Merrill Dow Pharmaceuticals, 509 U.S. 579, 113 S. Ct. 2786 (1993).  Mitsubishi also moves for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 56 for all of plaintiffs' claims.  Plaintiffs concede that the statute of limitations for their breach of warranty claim has lapsed but oppose Mitsubishi's motions in all other respects.  Accordingly, the breach of warranty

---

[1] It is unclear whether or not Citicorp Del-Lease, Inc. was ever served with the summons and complaint. See Pls.' Compl., Ex. A to Def.'s Notice of Removal, Dkt. No. 1, 21 (filing an affidavit of service of the summons and complaint upon only defendant Mitsubishi). Mitsubishi electronically filed an affidavit of service of removal papers pursuant to Local Rule 4.1(c) showing that Citicorp's attorneys, the law firm of Ohrenstein & Brown, LLP, were given notice of the removal of plaintiffs' lawsuit to federal court. See Timoshenko Aff., Dkt. No. 5. There was also some correspondence between the parties as to discontinuing the action against Citicorp so long as it provided an affidavit stating it had no part in the sale or distribution of the product in question. See Seebold Letter, Ex. B to Def.'s Notice of Removal, Dkt. No. 1, 23. In any event, this defendant has never appeared in the action nor has plaintiff moved for a default judgment. Therefore, unless circumstances change, its name will not be included in the title of further proceedings.

claim will be dismissed without further consideration.

Oral argument was heard on December 15, 2008.  Decision was reserved.

## II.  **BACKGROUND**

Mr. Milliman was hired as a "product picker" for Primesource Building Products, Inc. (hereinafter "Primesource") in late January 2004.  His employment duties primarily consisted of retrieving various construction products from warehouse shelves after reviewing customers' order forms.  Many of Primesource's warehouse shelves are stacked several feet in the air, requiring product pickers such as Mr. Milliman to be lifted high above the ground by way of a forklift-like machine commonly referred to as an "orderpicker."  On March 15, 2004, Mr. Milliman fell a distance through the air from an orderpicker sold by defendant, thereby suffering severe and permanent physical injuries to his feet.  In the moments before he fell, Mr. Milliman lost his balance while attempting to place a fifty-pound box of screws on the pallet of the orderpicker.  Both parties agree that the orderpicker was delivered with a yellow warning label instructing product pickers to use a safety harness when operating the machine at elevation.  At the time of his fall, Mr. Milliman was not wearing a safety harness, no safety tether or harness was attached to the orderpicker, and the yellow warning label was no longer affixed to the machine.

Subsequent to the removal of plaintiffs' lawsuit into federal court, defendant moved to strike the report of plaintiffs' expert witness, Dr. Ali Engin, for failure to comply with Federal Rule of Civil Procedure 26, and alternatively, to preclude Dr. Engin from testifying at trial under Federal Rule of Evidence 702 and Daubert.  In response to the Rule 26 challenge, plaintiffs provided defendant with Dr. Engin's expert disclosure documents.  Following oral argument on July 11, 2008, defendant's motion was adjourned *sine die* to allow defendant to

depose Dr. Engin before either renewing or withdrawing its motion.

Dr. Engin was deposed on August 21, 2008, whereupon he discussed the basis for his opinions and his experience as a mechanical engineer. See Engin Dep., Exs. 3A-3C to Def's. Mot. to Strike Pls.' Expert Designation, Dkt. Nos. 34-6, 34-7, 34-8.  A summary of his opinions are as follows:

(1) instead of a safety tether that could be attached at the election of the operator, the orderpicker should have been designed with a safety tether permanently attached to the overhead platform of the machine;

(2) the safety harness used with the orderpicker should have been an integral part of the safety tether, i.e., the harness should have been permanently attached to the tether;

(3) defendant did not design an orderpicker with a fully retractable safety tether;

(4) there should have been a large, concise, standing alone warning sign on a metallic surface instructing users that the safety tether and harness should be used at all times during operation;

(5) the orderpicker should have been designed with an interlock device preventing operation without use of the safety tether and harness;

(6) as either an alternative or supplement to a permanently attached safety tether and harness restraint system, the orderpicker could have been designed with guardrails around the perimeter of the operator platform which would have prevented Mr. Milliman's fall; and

(7) because of the distance Mr. Milliman fell, he suffered injuries to parts of his body other than where he impacted the ground.

Supplemental Engin Report, Ex. 2 to Def's. Mot. to Strike Pls.' Expert Designation, Dkt. No. 34-5, 2-6; <u>see also</u> Engin Report, Ex. 1 to Def's. Mot. to Strike Pls.' Expert Designation, Dkt. No. 34-4, 3-4.  Dr. Engin further opines that "incorporation of the above-referenced changes would not have been cost prohibitive, would have resulted in minimal additional cost per machine, and consists of revisions that were readily available, known, in existence and/or state of the art at the time the subject was designed and manufactured." Supplemental Engin Report, Ex. 2 to Def's. Mot. to Strike Pls.' Expert Designation, Dkt. No. 34-5, 5-6.

Also included in Dr. Engin's expert report is a summary of his qualifications. <u>See</u> <u>id</u>. at 6-7.  He received his Ph.D. in Engineering Mechanics in 1968 from the University of Michigan. <u>Id</u>.  From 1971 to 1995, he was a professor of Mechanical Engineering at Ohio State University. <u>Id</u>.  He has published over fifty articles in various academic journals focusing on issues of biomechanics. <u>See</u> Engin Report, Ex. 1 to Def's. Mot. to Strike Pls.' Expert Designation, Dkt. No. 34-4, 9-12.  For six years he served as the Editor-in-Chief of *Technology and Health Care*, an international journal of health care engineering, and he currently chairs the Mechanical Engineering department at the University of South Alabama. Supplemental Engin Report, Ex. 2 to Def's. Mot. to Strike Pls.' Expert Designation, Dkt. No. 34-5, 7.

Following Dr. Engin's deposition, defendant renewed its motion to strike his expert designation, or in the alternative, to preclude him from testifying.  Defendant submits that its summary judgment motion is not contingent upon whether Dr. Engin's opinions are preluded.

## III.  DISCUSSION

Defendant presents three issues for consideration.  <u>First</u>, defendant argues that Dr. Engin lacks the required experience, training, and education to be qualified as an expert with respect to the design of defendant's orderpicker.  <u>Second</u>, defendant challenges the reliability of Dr. Engin's proffered opinion testimony stated in his deposition.  <u>Third</u>, defendant contends it is entitled to judgment as a matter of law because there are no genuine issues as to any material facts.

### A.  Defendant's Motion to Disqualify Dr. Engin as an Expert Witness

Federal Rule of Evidence 702 allows the opinion testimony of experts when the witness is "qualified as an expert by knowledge, skill, experience, training, or education, [and i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine the fact in issue." FED. R. EVID. 702.  With respect to the scope of an expert's credentials, "courts have not barred an expert from testifying merely because he or she lacks a degree or training narrowly matching the point of dispute in the lawsuit. <u>Canino v. HRP, Inc.</u>, 105 F. Supp. 2d 21, 27 (N.D.N.Y. 2000).  Rather, when "well-trained people with somewhat more general qualifications are available, it is error to exclude them." <u>Stagl v. Delta Air Lines, Inc.</u>, 117 F.3d 76, 82 (2d Cir. 1997).  Nevertheless, the designation of a witness as an expert must remain "within the reasonable confines of his subject area, and [a witness] cannot render expert opinion on an entirely different field or discipline." <u>Lappe v. Am. Honda Motor Co., Inc.</u>, 857 F. Supp. 222, 227 (N.D.N.Y. 1994) (citing <u>Wheeler v. John Deere Co.</u>, 935 F.2d 1090, 1100 (10th Cir. 1991)).

Defendant takes issue with the scope and area of Dr. Engin's expertise.  Although defendant acknowledges he may be an expert in the field of biomechanics, i.e., how forces

are imparted onto the human body, defendant objects to his qualifications as an expert in orderpicker design.  In support of its position, defendant references the following admissions made by Dr. Engin at his deposition: none of the articles he has published discuss safety harnesses or fall protection; he has never designed an orderpicker or any of its components; he has never operated an orderpicker; he has never tested an orderpicker; he has never seen an orderpicker in operation in connection with his work for this case; and he has never designed a warning label for an orderpicker. <u>See</u> Engin Dep., Ex. 3A to Def's. Mot. to Strike Pls.' Expert, Dkt. No. 34-6, 29-32, 39-40.  For these reasons, defendant maintains that Dr. Engin lacks the necessary experience to qualify as an expert on the design of orderpickers.

The Second Circuit has held, however, that "quibble" over an expert's experience, academic training, and other alleged shortcomings go to the weight and credibility of an expert's testimony instead of the admissibility of his opinions, and therefore, such issues are best explored during cross-examination. <u>McCullock v. H.B. Fuller Co.</u>, 61 F.3d 1038, 1043 (2d Cir. 1995).  Regardless of any arguments for why he may not competently testify as to the design of orderpickers, Dr. Engin undisputably has extensive experience in the field of biomechanical engineering.  This experience qualifies as "specialized knowledge" gained through "experience, training, or education." FED. R. EVID. 702.

Defendant relies heavily upon <u>Berry v. Crown Equip. Corp.</u>, 108 F. Supp. 2d 743 (E.D. Mich. 2000) as a supposedly analogous case. <u>See</u> Def's. Mem. of Law in Supp. of Mot. to Strike Pls.' Expert, Dkt. No. 34-3, 9-10.  Although defendant contends that <u>Berry</u> serves as an example of "courts confronted with nearly identically 'qualified' proposed 'experts' [that] have not hesitated to bar them from testifying under <u>Daubert</u>," Def's. Mot. to Strike Pls.' Expert, Dkt. No. 34-3, 9, defendant either overlooks or intentionally omits a number of

distinguishing factors pertaining to the expert in <u>Berry</u>.  For example, the expert considered in <u>Berry</u> held himself out as a self-employed "safety consultant" as opposed to the chair of the Mechanical Engineering Department at a university. <u>See</u> <u>Berry</u>, 108 F. Supp. 2d at 750.  The same expert also admitted he had only published one article nearly twenty years prior to his work in connection with the plaintiffs' case, whereas Dr. Engin has published hundreds of articles, at least fifty of which pertain to issues concerning biomechanics. <u>See</u> <u>id</u>.  The expert in <u>Berry</u> also admitted he had never held any leadership positions in either of the professional organizations he was a member of, whereas Dr. Engin served as the Editor-in-Chief of an international journal of health care engineering.  <u>See</u> <u>id</u>.  Finally, and perhaps most importantly, the expert in <u>Berry</u> held no graduate degrees. <u>See</u> <u>id</u>.  Instead, he merely held a Bachelor of Science degree in Speech and minors in English and Science. <u>See</u> <u>id</u>. This lack of academic training obviously pales in comparison to Dr. Engin's educational background and service as a professor of mechanical engineering.  Although the expert in <u>Berry</u>, as does Dr. Engin, had relatively little experience working with forklifts and similar machines before offering his opinions on the design of the defendant's machine, his utter lack of qualifications far exceed any alleged deficiencies in Dr. Engin's basis to testify competently as an expert witness.  Defendant's argument as to Dr. Engin is best reserved for cross-examination, and therefore, the motion to strike his expert designation will be denied.

### B. <u>Defendant's Motion to Bar Dr. Engin's Proffered Testimony</u>

Having determined that Dr. Engin is qualified to testify as an expert, the next inquiry is whether his proffered opinion testimony will (1) constitute scientific knowledge; and (2) assist the trier of fact to understand the evidence or determine a fact in issue. FED. R. EVID. 702; <u>Daubert</u>, 509 U.S. at 592, 113 S. Ct. at 2796.  Defendant's challenge to Dr. Engin's

testimony is limited to whether it is sufficiently reliable to be admitted at trial and does not

contend that his opinions, if true, would not assist the trier of fact to understand the issues

presented.  Accordingly, discussion of Dr. Engin's testimony will be limited to whether his

opinions constitute scientific knowledge.

The Supreme Court has delineated several factors which may be considered in the

determination of whether an expert's opinion constitutes scientific knowledge for the

purposes of Rule 702, including: (1) whether the opinion can be, and has been, tested; (2)

whether the expert's theory has been subjected to peer review and publication; (3) whether

the witness's opinion has been generally accepted in the relevant scientific community; and

(4) the known or potential rate of error in the expert's technique. Daubert, 509 U.S. at 592-

95, 113 S. Ct. at 2796-97.  Since Daubert was decided, the Supreme Court has explained

that this list of factors is neither required for all experts nor does it serve as an exclusive list

for determining the admissibility of expert opinion testimony. Kumho Tire Co., Ltd. v.

Carmichael, 526 U.S. 137, 141-42, 119 S. Ct. 1167, 1171 (1999).

The Second Circuit has held that "by loosening the strictures on scientific evidence

set by Frye[ v. United States, 293 F. 1013 (D.C. Cir. 1923)], Daubert reinforces the idea that

there should be a presumption of admissibility of evidence."  Borawick v. Shay, 68 F.3d 597,

610 (2d Cir. 1995).  Rather than require parties to conclusively prove the reliability of their

expert's testimony, courts should favor the admissibility of "questionable" expert opinions and

depend upon "the power of the adversary system to test 'shaky but admissible' evidence." Id.

(citing Daubert, 509 U.S. at 596, 113 S. Ct. at 2798).  The Borawick court further illustrated

that "Daubert allows for the admissibility of scientific evidence, even if not generally accepted

in the relevant scientific community, provided that its reliability has independent support."

Borawick, 68 F.3d at 610.  Notwithstanding the broad range of potential factors and the presumption of admissibility, courts are not required "to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997).

Defendant argues that Dr. Engin's proffered expert opinions with regard to the design of the orderpicker fail under all four of the Daubert factors.  In particular, defendant emphasizes Dr. Engin's admission that he has not constructed his own prototype of what he believes should be the proper design for an orderpicker or, alternatively, identified any other orderpicker manufacturer which has incorporated his proposed design alternatives. Engin Dep., Ex. 3B to Def's. Mot. to Strike Pls.' Expert, Dkt. No. 34-7, 98-100.  Defendant also challenges his opinion that the design changes could have been implemented without considerable cost to defendant on the grounds that he admits in his deposition that he has made "some estimates" but has yet to conduct any cost analysis of any of his proposed design modifications. Id. at 156-57.

Dr. Engin's own admissions that he has neither created a prototype nor identified another manufacturer which has incorporated his proposed alternative design necessarily leads to the conclusion that his methodology has not been (1) tested; (2) subject to peer review or publication; or (3) generally accepted in the scientific community. See Daubert, 509 U.S. at 592-95, 113 S. Ct. at 2796-97.  Additionally, the "known rate of error" factor identified in Daubert does not aid in the determination of whether Dr. Engin's opinions are adequately reliable.  Instead of constructing an orderpicker incorporating his own alternative design, Dr. Engin states that his review of the materials he was presented, together with his experience

in the relative field of mechanical engineering, leads him to believe defendant should have manufactured an orderpicker with his proposed design changes, i.e., a permanently attached safety tether and harness; a standing alone warning label written on a metallic surface; an interlock device preventing operation of the machine without use of a safety harness; and, as an alternative to a safety harness, segmented guardrails around the perimeter of the operator platform. See Supplemental Engin Report, Ex. 2 to Def's. Mot. to Strike Pls.' Expert Designation, Dkt. No. 34-5, 2-5 (stating Dr. Engin's proposed design changes); see also Engin Dep., Ex. 3B to Def's. Mot. to Strike Pls.' Expert Designation, Dkt. No. 34-7, 123-24 (discussing his opinion that the technology exists to create his alternative design of a permanently attached safety harness); id. at 137-43 (discussing his belief that an interlock device can be incorporated with the use of an orderpicker because such devices are commonly used in a variety of other machines).  Dr. Engin's methodology is therefore his experience in the field of biomechanics and mechanical engineering.  The relevant issue then becomes whether his experience and training in these areas provides an independent and reliable basis for each of his opinions despite the apparent failure under, or the imperfect application of, the Daubert factors. See Borawick, 68 F.3d at 610 (admitting an expert's opinion regardless of failure under the Daubert factors so long as the reliability of the proffered opinion has "independent support"); see also Kumho Tire Co., 526 U.S. at 141-42, 119 S. Ct. at 1171 (holding Daubert factors are not an exclusive list of factors for determining admissibility).

Although Dr. Engin states eight individually numbered opinions in his report, the opinions can be further divided as follows: opinions concerning (1) the safety tether and harness; (2) the warning label; (3) a proposed interlock device; (4) a proposed segmented

guard rail around the platform; and (5) Mr. Milliman's injuries.  Finally, he concludes with a general statement as to his opinion that none of his proposed design changes would have been cost prohibitive.  His opinion as to Mr. Milliman's injuries–identified as opinion number eight in his supplemental report–will not be discussed as defendant does not offer an argument for why that opinion is inadmissible.  Further, his opinions regarding the orderpicker's warning label will be discussed later in connection with defendant's motion for summary judgment.

## 1.  The Safety Tether and Harness

While the testing of a prototype is undoubtedly one of the preferred methods for determining the reliability of an expert's opinion, testing is not necessarily a requirement for the admission of expert testimony. <u>Cummins v. Lyle Indus.</u>, 93 F.3d 362, 369 (7th Cir. 1996); <u>see also</u> <u>Colombo v. CMI Corp.</u>, 26 F. Supp. 2d 574, 577 (W.D.N.Y. 1998) (admitting expert testimony despite expert's lack of testing, prototypes, or drawings); <u>Surace v. Caterpillar, Inc.</u>, No. 94-1422, 1995 WL 303895, at *2-3 (E.D. Pa. 1995) (allowing testimony of mechanical and safety engineering expert despite no prototype, testing, or publication of the expert's opinions), <u>aff'd in part, rev'd in part on other grounds</u>, 111 F.3d 1039 (3d Cir. 1997).

Dr. Engin bases his opinion that the orderpicker should have had a permanently attached safety tether and harness upon his interpretation of the applicable safety standard of the American National Standards Institute, "ASME-B56.1-1993, Safety Standard for Low Lift and high Lift Trucks" (hereinafter "ANSI-B56.1"). <u>See</u> Engin Dep., Ex. 3B to Def's. Mot. to Strike Pls.' Expert Designation, Dkt. No. 34-7, 100-01.  ANSI-B56.1 § 7.35.1 states, in pertinent part: "Platforms used for elevating personnel shall have . . . restraining means such as a guard rail or a means for securing personnel such as a body belt and lanyard[, and

such] lanyards *shall be attached* to an overhead member of the platform at a point located above and near the center of the platform." ANSI-B56.1, Ex. 21 to Def's. Mot. for Summ. J., Dkt. No. 35-25, 51-52 (emphasis added).[2]   Dr. Engin's reading of the words, "shall be attached" lead him to believe defendant should have manufactured an orderpicker with a safety tether and harness that could not be removed without the use of "special tools" as opposed to the use of an "attachable" safety tether and harness that could easily be removed by hand. See Engin Dep., Ex. 3B to Def's. Mot. to Strike Pls.' Expert Designation, Dkt. No. 34-7, 100-02; see also Supplemental Engin Report, Ex. 2 to Def's. Mot. to Strike Pls.' Expert Designation, Dkt. No. 34-5, 3-4.

For the same reasons Dr. Engin is qualified as an expert witness, his educational and professional background render his experience as a reliable basis for admitting his interpretation of the applicable ANSI standard.  Moreover, his opinions concerning the use of a permanently attached, non-retractable safety tether and harness do not rise to the level of intricacy or scientific complexity requiring testing of his proposed design changes.  Rather, his extensive experience in biomechanics and mechanical engineering, coupled with the materials he reviewed and his interpretation of the applicable safety standards, constitute a reliable basis for his opinion.  Should defendant choose to dispute the plausibility and

---

[2] According to plaintiffs' response to defendant's statement of material facts, the section number of the applicable provision has changed due to a later revision of the ANSI standards.  However, the exhibits filed electronically refer to section numbers used prior to the revision.  In any event, the language of the applicable standard remains exactly the same and neither party disputes the content of the standard; rather, the parties contest the proper interpretation of the same language.

Additionally, use of the term "lanyard" is synonymous with the term "tether."  Both terms refer to a cable hanging down from the overhead area of the orderpicker's platform, whereas the terms "harness" or "belt" refer to the safety device worn by the machine's operator and attached to the lanyard or tether in order to prevent the operator from falling to the ground should he lose his balance from the platform.

usefulness of *permanently* attaching two pieces of material that are undisputably capable of being connected to one another, defendant is welcome to raise that issue before the jury.

### 2.  **The Interlock Device**

In contrast, Dr. Engin's proposed interlock device does not involve rendering a temporary aspect of the orderpicker permanent.  His alternative design of an interlock device is akin to a "kill switch" which would disable the ignition to the orderpicker unless the safety tether and harness were sufficiently extended to the point where it is worn by the operator. See Engin Dep., Ex. 3B to Def's. Mot. to Strike Pls.' Expert Designation, Dkt. No. 34-7, 138-41 (Dr. Engin's discussion of how he would design the interlock device).  He speculates that the interlock device could be "a three dollar switch" or "a couple hundred dollars electromagnetic system." Id.  He defends his hypothesis by citing examples of interlock devices in other machines such as dishwashers, microwave ovens, and lawnmowers. Id. at 139, 141.

Dr. Engin's alternative design of an interlock device is insufficiently reliable for several reasons. First, he has never designed an orderpicker with an interlock device and is unable to identify any orderpicker with such a device, thereby calling into question the feasibility of his alternative design.  Second, he has no basis for his opinion that such a design is possible except to the extent that other machines entirely different from orderpickers utilize interlock devices.  Third, he readily admits that he has conducted no research into the cost of an interlock design.  Id. at 143.  Even if his estimation of the purchase price for an interlock device is assumed accurate, he has no reliable basis for determining the cost of *installing and implementing* such a device in defendant's orderpicker, especially in light of his lack of research and testing.  Unlike with his opinion that the safety

tether/harness device should have been permanently attached, his alternative design of an interlock device does not seek to merely make permanent an already attachable device. Instead, Dr. Engin's proposed interlock device constitutes a much more substantial modification to the orderpicker.[3]  Additionally, and again in contrast to his opinion concerning the safety tether and harness, there is no safety standard open to his interpretation which may arguably call for the design of an interlock device. See Engin Dep., Ex. 3B to Def's. Mot. to Strike Pls.' Expert Designation, Dkt. No. 34-7, 141 (Dr. Engin admitting he cannot identify any safety standard, statute, or government regulation that requires his alternative design of an interlock device).

Dr. Engin's experience and examination of the materials presented to him for review does not provide a sufficient independent basis for his opinion that the orderpicker should have, let alone could have, been designed with an interlock device.  Without being able to identify any type of an interlock device already installed on any orderpicker, he must do more than opine that an interlock device should have been designed.  Therefore, his opinion in regards to the alternative design of an interlock device will be inadmissible.

### 3.  The Segmented Guard Rail

Defendant argues that Dr. Engin's alternative design of a guard rail is in conflict with the applicable safety standard because it calls for both guard rails and a safety belt

---

[3] For example, assume defendant's orderpicker was originally designed with an interlock device as well as a switch allowing the operator to disable the interlock device.  Assume further that there was an applicable federal safety standard requiring orderpickers to be designed with interlock devices.  Under this scenario, an expert may very well be able to offer his opinion that, pursuant to the applicable federal standard and his experience in the relevant field of study, the orderpicker should have been designed without a switch permitting the operator to disable the interlock device.  While this hypothetical situation parallels that of Dr. Engin's alternative safety tether/harness design, the factual circumstances giving rise to Dr. Engin's alternative design of an interlock device are very different.

system.  ANSI-B56.1 § 7.35.1(d) requires the platforms of orderpickers be equipped with "restraining means such as a guard rail or a means for securing personnel such as a body belt and lanyard." ANSI-B56.1, Ex. 21 to Def's. Mot. for Summ. J., Dkt. No. 35-25, 51.  Dr. Engin concedes that the safety standard requires manufacturers only provide either a guard rail or a body belt and lanyard and that incorporation of both safety measures is not required. See Engin Dep., Ex. 3B to Def's. Mot. to Strike Pls.' Expert Designation, Dkt. No. 34-7, 144. He also attempts to explain that his opinion calls for a guard rail as "an alternative or an addition to the safety belt system." Id. at 144-45; see also Supplemental Engin Report, Ex. 2 to Def's. Mot. to Strike Pls.' Expert Designation, Dkt. No. 34-5, 5 (stating the same in opinion number seven).

Defendant does not raise a valid argument for why Dr. Engin's opinion concerning a segmented guard rail is unreliable.  Not only does his opinion appear to conform with the applicable safety standard in some respects, but any alleged conflict with the standards only goes to the weight of his opinion rather than its admissibility.  Defendant's argument pertaining to Dr. Engin's alternative guard rail design is limited to its comparison with the ANSI standard. See Def's. Mem. of Law in Supp. of Mot. to Strike Pls.' Expert, Dkt. No. 34-3, 20-21. Therefore, his opinion that the order picker could have been designed with guard rails as an alternative, or in addition to, the safety belt system will be admissible.

### 4.  The Cost of Dr. Engin's Alternative Design

Defendant's motion to preclude Dr. Engin's opinions will be granted to the extent he seeks to testify that incorporation of his proposed design changes would not have been cost prohibitive.  He repeatedly states during his deposition testimony that he has not conducted any cost analysis as to any of the design alternatives he believes should have been made to

the orderpicker. See Engin Dep., Ex. 3B to Def's. Mot. to Strike Pls.' Expert Designation, Dkt. No. 34-7, 143, 146, 156-57.  His statement that he "could make some estimates in [his] mind" is wholly inadequate to permit him to testify that incorporation of his alternative design changes would not have been cost prohibitive.  Put simply, Dr. Engin's opinion with respect to the cost of his proposed modifications extends well beyond the purview of the limited work he appears to have performed.  Accordingly, his testimony concerning the cost of his design changes will be inadmissible.

### C.  Defendant's Motion for Summary Judgment

Summary judgment is warranted when the pleadings, depositions, answers to interrogatories, admissions, and affidavits reveal no genuine issue as to any material fact. FED. R. CIV. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986).  All facts, inferences, and ambiguities must be viewed in a light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986).  Initially, the burden is on the moving party to demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2458 (1986).  After the moving party has satisfied its burden, the non-moving party must assert specific facts demonstrating there is a genuine issue to be decided at trial. FED. R. CIV. P. 56; Liberty Lobby, Inc., 450 U.S. at 250, 106 S. Ct. at 2511. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S. Ct. at 1356.  There must be sufficient evidence upon which a reasonable fact finder could return a verdict for the non-moving party. Liberty Lobby, Inc., 477 U.S. at 248-49, 106 S. Ct. at 2510; Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356.

Defendant alleges several grounds in support of its Rule 56 motion for summary judgment: (1) there was substantial alteration to the safety measures designed for the orderpicker following delivery; (2) unforeseeable misuse of the orderpicker caused Mr. Milliman's injuries; (3) there is insufficient evidence as to the proximate cause of Mr. Milliman's injuries; (4) defendant owes no duty to warn against open and obvious dangers; (5) plaintiffs' claims are preempted by the applicable federal standards; and (6) as already mentioned, plaintiffs' breach of warranty claim is barred by the statute of limitations.

### 1.  Alteration of the Orderpicker After Delivery

Defendant contends either Mr. Milliman or another Primesource employee materially altered the orderpicker after it was delivered by removing the safety tether and harness.  Pursuant to New York law, a manufacturer may not be held liable if a substantial alteration made to a product after its delivery is the proximate cause of the plaintiff's injuries. Robinson v. Reed-Prentice Div. of Package Mach. Co., 49 N.Y.2d 471, 475, 426 N.Y.S2d 717, 718 (1980).  The issue presented is therefore whether there is a genuine issue of material fact as to the alleged occurrence of a subsequent modification, and whether the subsequent modification, if any, was sufficiently substantial to bar plaintiffs from holding defendant liable.

### a.  Delivery of the Orderpicker

Defendant maintains that there is no genuine issue as to whether the orderpicker was modified after delivery because plaintiffs concede in their motion papers and interrogatory responses that the orderpicker was delivered with a safety tether and harness. To the contrary, however, plaintiffs make clear in the very same section of their memorandum of law cited by defendant that "[t]his contention is not conceded by the

plaintiffs." Pls.' Mem. in Opp'n to Summ. J., Dkt. No. 40-4, 2.  Further, the interrogatory

response cited by defendant in support of their argument states plaintiffs' contention that

"[t]he design or manufacturing defect consisted of a readily removable or optionally available

retractable tether with a non-permanently affixed safety belt." Interrog. No. 6, Ex. 22 to Def's.

Reply, Dkt. No. 45-2, 9.  The words "readily removable or optionally available" do not

necessarily reflect a concession as to the existence of a safety tether and harness upon

delivery of the orderpicker.  In particular, plaintiffs' response that the safety tether and

harness were "optionally available" could indicate their contention that the safety equipment

in question was only available at the election of the purchaser.

Most importantly, plaintiffs' response to defendant's statement of material facts

unequivocally denies defendant's assertion that the orderpicker was shipped with the

required safety tether and harness.  See Pls.' Resp. to Def's. Statement of Material Facts,

Dkt. No. 40-10, ¶ 60.  Instead, plaintiffs cite the deposition of defendant's expert, Michael

Rogers, in support of their argument that there is no evidence affirmatively indicating the

safety tether and harness were packaged with the orderpicker upon delivery as stated by

defendant's representative, Keith Van Hook.  See Rogers Dep., Ex. C to Pls.' Resp. in Opp'n

to Summ. J., Dkt. No. 40-6, 77.

Taking all facts, inferences, and ambiguities in the light most favorable to the non-

moving party, there is a genuine issue of fact as to whether the orderpicker was delivered

with the required safety tether and harness.  Plaintiffs clearly contest defendant's assertion

that the orderpicker was delivered with a safety tether and harness equipment.  To the extent

defendant's representative testified during his deposition that the orderpicker was delivered

with the required safety device, his statements are limited to his knowledge of defendant's

orderpickers in general and a review of the delivery records for the orderpicker in question. See Van Hook Dep., Ex. 2 to Def's. Mot. for Summ. J., Dkt. No. 35-6, 127.  Therefore, plaintiff has not conceded this issue, and as the moving party, defendant has not satisfied its burden to show an absence of a genuine issue of material fact.

### b.  Substantial Alteration

Even assuming the orderpicker was delivered with the safety tether and harness, defendant concedes that the safety equipment was packaged within the battery compartment as opposed to physically attached to the machine.  See Def's. Statement of Material Facts, Dkt. No. 35-3, ¶ 60.  Accordingly, under either party's version of events, the tether and harness were not attached to the orderpicker upon delivery.

Defendant argues that the removal of the restraint device after delivery constituted a substantial alteration to the machine's safety measures, thereby barring plaintiff from holding it liable in a products liability action.  See Robinson, 49 N.Y.2d at 475, 480-81, 426 N.Y.S.2d at 721.  In Robinson, the plaintiff was barred from asserting its claim against the defendant-manufacturer because the plaintiff's employer cut a hole of approximately six by fourteen inches in the Plexiglas portion of the machine's safety gate. Id. at 477, 426 N.Y.S.2d at 719.  The court reasoned that manufacturers were not required to incorporate safety features that would protect against all reckless acts and that the duty of a manufacturer "extends to the design and manufacture of a finished product which is safe *at the time of sale*." Id. at 481, 426 N.Y.S.2d at 721 (emphasis added).

Defendant's admission that the safety tether and harness were not attached upon delivery is particularly significant because it diminishes the extent to which the orderpicker was "altered" after delivery.  Unlike the machine at issue in Robinson, there was no *functional*

safety measure already in place when defendant's orderpicker was delivered.  Rather, it is

undisputed that further assembly was required after delivery to make the safety device

effective because the safety tether had to be attached to the orderpicker and the harness

attached to the safety tether.  As a result of defendant's decision to package the restraint

equipment in the battery compartment of the orderpicker instead of deliver the machine with

a permanently attached safety tether and harness–the very aspect of the design from which

plaintiffs' claim arises–the orderpicker was arguably no safer at the time of sale as it was

when Mr. Milliman fell from the platform because, in both instances, the orderpicker did not

have an attached safety tether and harness.

Although defendant has raised some questions as to whether Primesource had the

obligation to ensure the orderpicker was fitted with the required safety equipment, that issue

is not relevant for the purposes of determining if the orderpicker was substantially altered

after it was delivered.  Any subsequent alteration to the orderpicker that did occur did not rise

to the level of or recklessness identified in <u>Robinson</u> because there is no evidence to suggest

that Primesource or any of its employees "destroy[ed] the functional utility of a key safety

feature."   Defendant's own admission reveals that the safety equipment allegedly included

within the battery compartment of the orderpicker required further alterations and/or

assembly before becoming functional and effective.  Therefore, there is a genuine issue of

fact as to whether the orderpicker was substantially altered after delivery.

## 2.  <u>Unforeseeable Misuse</u>

Defendant argues summary judgment is warranted because the conduct of Mr.

Milliman and Primesource was sufficiently egregious to constitute unforeseeable misuse as a

matter of law and that such misuse caused Mr. Milliman's injuries.  Under New York law,

manufacturers may be held liable for their failure to use reasonable care in designing or

manufacturing products so long as the product is used either in the manner in which it was

intended or, if used in an unintended manner, so long as the use was reasonably

foreseeable. Liriano v. Hobart Corp., 92 N.Y.2d 232, 237, 677 N.Y.S.2d 766 (1998) (citations

omitted).

Defendant identifies a number of instances of misconduct by either Mr. Milliman or

Primesource, all of which it contends rise to the level of unforeseeable misuse: (1) Mr.

Milliman received no more than twenty minutes of informal training as to how to operate the

orderpicker; (2) Mr. Milliman was not certified to use the orderpicker; (3) Mr. Milliman's

employer violated the applicable federal work practice standards; (4) Mr. Milliman ignored the

warnings to read the operator's manual which includes an instruction to always use the

safety tether and wear the safety harness when operating the orderpicker; (5) Mr. Milliman in

fact never read the operator's manual; and (6) Mr. Milliman ignored his employer's own

policies to use the safety tether and wear the safety harness at all times when operating the

orderpicker.  Plaintiffs do not contest these factual allegations, many of which were admitted

by Mr. Milliman during his deposition. See Milliman Dep., Ex. 1 to Def's. Mot. for Summ. J.,

Dkt. No. 35-5, 34, 41, 50.

Defendant cites Bombara v. Rogers Bros. Corp., 289 A.D.2d 356 (N.Y. App. Div. 2d

Dept. 2001) in support of its argument that the conduct referenced above constitutes

unforeseeable misuse as a matter of law.  The plaintiff in Bombara was riding on the rear of

an open trailer manufactured by the defendant before falling into the open wheel well of the

tractor. Id.  The court held the manufacturer was entitled to summary judgment because the

plaintiff's use of the trailer was neither in the manner it was intended nor reasonably

foreseeable. Id. at 357.  The court reasoned that the trailer was designed to transport

construction equipment instead of passengers and that the plaintiff failed to raise a triable

issue of fact with respect to the foreseeability of his conduct. Id.

Although there is surely a question of whether the conduct of Mr. Milliman and

Primesource was foreseeable, defendant's argument cannot overcome the fact that Mr.

Milliman was using the orderpicker in a manner in which it was intended.  Even if defendant

were to assert that the orderpicker was intended to be used only with its safety tether and

harness, Mr. Milliman obviously used the orderpicker in a much more foreseeable manner

than did the plaintiff in Bombara as he was standing on a platform designed for operators

such as himself, whereas the plaintiff in Bombara was riding on top of a trailer intended

solely for the transportation of construction equipment.  Therefore, there is a genuine issue of

fact in relation to the foreseeability of the conduct of Mr. Milliman and Primesource, and the

alleged misuse of the orderpicker was not unforeseeable as a matter of law.

### 3.  Evidence of the Proximate Cause of Mr. Milliman's Injuries

Defendant additionally argues that there is insufficient evidence that its negligence,

if any, was a substantial cause of Mr. Milliman's injuries given the extraordinary conduct of

Mr. Milliman and Primesource before the accident occurred.  In order to establish a *prima*

*facie* case of proximate cause under New York law, "a plaintiff must show 'that the

defendant's negligence was a substantial cause of the events which produced the injury.'"

Maheshwari v. City of New York, 2 N.Y.3d 288, 295, 778 N.Y.S.2d 442, 446 (2004) (quoting

Derdiarian v. Felix Contr. Corp., 51 N.Y.2d 308, 315, 434 N.Y.S.2d 166, 169 (1980)).  The

intervening acts of the plaintiff or a third party does not necessarily sever the causal

connection, however. Derdiarian, 51 N.Y.2d at 315, 434 N.Y.S.2d at 169.  When considering

the significance of an intervening act, proof of proximate cause depends upon whether the act is a foreseeable consequence of the situation alleged to have been the result of the defendant's negligence. Id.  In further explanation, courts instruct that such acts must either be extraordinary in nature or have the effect of attenuating the defendant's negligence from the plaintiff's ultimate injury. See Kush by Marszalek v. City of Buffalo, 59 N.Y.2d 26, 33, 462 N.Y.S.2d 831, 835 (1983).  Notwithstanding the applicable legal standard, "the question of proximate cause is to be decided by the finder of fact, aided by appropriate instructions," and only the most extreme instances of superceding causes will warrant dismissal before trial. Derdiarian, 51 N.Y.2d at 312, 315, 434 N.Y.S.2d at 168, 170.

Defendant's argument therefore rests upon its contention that the conduct of Mr. Milliman and Primesource constituted unforeseeable misuse.  For the same reasons already discussed, the conduct in question is not unforeseeable as a matter of law.  The crux of plaintiffs' claim is that defendant should have manufactured its orderpicker with a permanently attached safety tether and harness so that operators could not easily remove the restraints.  That Mr. Milliman ignored the warnings to attach the safety equipment himself does not attenuate defendant's alleged design defect from his ultimate injury.  Indeed, the fact that the orderpicker was delivered without an attached safety tether and harness is sufficient for a reasonable fact finder to determine that Mr. Milliman's use of the machine was foreseeable.  Therefore, plaintiffs have established a *prima facie* case of proximate cause.

### 4.  Failure to Warn

Defendant contends plaintiffs' failure to warn claim should be dismissed on two separate grounds.  First, defendant asserts that it owed no duty to warn Mr. Milliman of open and obvious dangers such as falling from the orderpicker's platform while elevated.  Second,

defendant argues that even if it did owe Mr. Milliman a duty to warn against the risk of falling

from the platform, there was no breach of the duty to warn because it is undisputed that the

orderpicker was delivered with decals warning against the danger of operating the

orderpicker without using the required restraint devices.

### a. <u>Open and Obvious Dangers</u>

A manufacturer is relieved of its duty to warn "if the plaintiff knows of the danger or

if the danger is well known and should be obvious to anyone." <u>Smith v. Hub Mfg., Inc.</u>, 634 F.

Supp. 1505, 1508 (N.D.N.Y. 1986) (citing <u>Jiminez v. Dreis & Krump Mfg. Co.</u>, 735 F.2d 51,

55 (2d Cir. 1984); <u>Kerr v. Koemm</u>, 557 F. Supp. 283, 287 (S.D.N.Y. 1983); <u>Torrogrossa v.

Towmotor Co.</u>, 44 N.Y.2d 709, 711, 405 N.Y.S.2d 448, 449 (1978)); <u>see</u> <u>also</u> RESTATEMENT

(THIRD) OF TORTS: PRODUCTS LIABILITY §2 cmt. j (1998).  In <u>Smith v. Hub Mfg., Inc.</u>, the court

held that the manufacturer of an above-ground pool did not owe a duty to warn against the

dangers of allowing children to play near the ladder to the pool because of the possibility that

children may climb the ladder and fall into the water. <u>Smith v. Hub Mfg., Inc.</u>, 634 F. Supp. at

1508.  The court reasoned that "the danger of swimming pools to small children is obvious

and well known." <u>Id</u>.  Further bolstering the court's decision was the determination that the

plaintiffs had personal knowledge of the danger of the pool to their son as they warned their

son of the risk of falling into the water, instructed their son not play nearby the pool without

an adult, and witnessed their son climb up the ladder alone prior to the accident. <u>Id</u>.

Much like the danger at issue in <u>Smith v. Hub Mfg., Inc.</u>, the risk of falling from the

platform of the orderpicker is obvious and well known.  The platform extends more than ten

feet into the air and provides a relatively small amount of space for employees to maneuver

and gain footing.  Moreover, Mr. Milliman admits he was aware of the dangers of falling from

the platform prior to his accident on March 15, 2004. <u>See</u> Milliman Dep., Ex. 1 to Def's. Mot.

for Summ. J., Dkt. No. 35-5, 144-45.  Accordingly, defendant had no duty to warn against the

risk of falling to the ground without use of the safety tether and harness because the danger

was obvious and Mr. Milliman admits he was aware of the danger prior to his accident.

Plaintiffs' duty to warn claim will therefore be dismissed without discussion of defendant's

argument as to the delivery of the orderpicker with warning labels.  Further, the admissibility

of Dr. Engin's opinion concerning the adequacy of the warning labels is moot in light of the

dismissal.

### 5.  Preemption by Federal Standards

Defendant alternatively argues that plaintiffs' claims are preempted by the

applicable federal safety standard, ANSI-B56.1.  Defendant submits two grounds for

preemption commonly referred to as field preemption and conflict preemption, respectively.

<u>See</u> <u>Gade v. Nat'l Solid Wastes Mgmt. Ass'n</u>, 505 U.S. 88, 98, 112 S. Ct. 2374, 2383 (1992)

(citations omitted).  First, defendant asserts that OSHA's adoption of the ANSI standard

established a comprehensive scheme for the design of the safety equipment needed for

machines such as the orderpicker, thereby rendering compliance with the ANSI standard

sufficient to bar plaintiffs' claims of design defect.  Second, defendant argues that plaintiffs'

claims should be barred because incorporation of plaintiffs' alternative design could put its

orderpicker in conflict with OSHA's adopted standards.

### a.  Field Preemption

Field preemption occurs when a federal regulatory scheme is "so pervasive as to

make reasonable the inference that Congress left no room for the States to supplement" the

regulations at issue. <u>Id.</u> (citing <u>Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta</u>, 458 U.S. 141,

153, 102 S. Ct. 3014, 3022 (1982) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218,

230, 67 S. Ct. 1146, 1152 (1947))).  Defendant's field preemption argument rests upon shaky

ground as the case defendant cites in support, Gonzalez v. Ideal Tile Importing Co., Inc., 184

N.J. 415, 877 A.2d 1247 (2005) concerned the interpretation of New Jersey law and, most

importantly, held that the relevant OSHA provisions did not provide for field preemption. Id. at

421, 877 A.2d at 1251.  Even assuming arguendo, however, that field preemption applies,

defendant's argument is nonetheless based upon its contention that the orderpicker was

designed in compliance with ANSI-B56.1 because it was delivered with a safety tether and

harness within the machine's battery compartment. See Def's. Mem. of Law in Supp. of Mot.

for Summ. J., Dkt. No. 35-4, 22 ("It is undisputed here that [defendant] provided a lanyard

and safety belt as standard items and are all that OSHA requires.  Nowhere does ANSI

require a 'permanently' attached lanyard or a belt that is permanently attached to the lanyard.

Plaintiffs' claims of defect simply ignore these applicable standards.")

      For reasons already discussed upon consideration of Dr. Engin's opinion regarding

the need for a permanently attached safety tether and harness, defendant's compliance with

the applicable ANSI standard cannot be assumed.  For starters, plaintiffs do not concede

that the safety tether and harness were packaged within the battery compartment upon

delivery.  Additionally, there is a genuine issue of fact as to the proper interpretation of ANSI-

B56.1 and that issue goes to the heart of plaintiffs' claim for design defect.  Defendant's

alleged compliance with the federal safety standard remains open to determination and thus

cannot serve as a basis for field preemption.  Accordingly, plaintiffs' claims are not barred by

the field preemption doctrine.

### b. **Conflict Preemption**

Conflict preemption is applicable if "compliance with both federal and state regulations is a physical impossibility," <u>Gade</u>, 505 U.S. at 98, 112 S. Ct. at 2383 (quoting <u>Fla. Lime & Avocado Growers, Inc. v. Paul</u>, 373 U.S. 132, 142-43, 83 S. Ct. 1210, 1217-18 (1963)), "or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" <u>Gade</u>, 505 U.S. at 98, 112 S. Ct. at 2383 (quoting <u>Hines v. Davidowitz</u>, 312 U.S. 52, 67, 61 S. Ct. 399, 404 (1941)).  In support of its conflict preemption argument, defendant reiterates its contention that Dr. Engin calls for the design of a segmented guardrail as a supplement to the safety tether and harness device. <u>See</u> Def's. Mem. of Law in Supp. of Mot. for Summ. J., Dkt. No. 35-4, 21 ("First, the ANSI standards give manufacturers *the option* of installing a 'guard rail *or* means for securing personnel such as a body belt or lanyard.'" (emphasis included in defendant's mem. of law) (quoting ANSI-B56.1 § 7.35.1(d), Ex. 21 to Def's. Mot. for Summ. J., Dkt. No. 35-25, 51).[4]

Defendant's conflict preemption argument must fail because plaintiffs do not call for incorporation of design changes in conflict with the applicable federal safety standard.  As discussed previously, Dr. Engin's opinion regarding the design of a segmented guard rail calls for a guard rail as "[a]n alternative (or in addition) to the safety belt system." <u>See</u> Supplemental Engin Report, Ex. 2 to Def's. Mot. to Strike Pls.' Expert Designation, Dkt. No. 34-5, 5.  As Dr. Engin attempted to explain during his deposition, he believes the orderpicker could have had a guard rail as an alternative to the safety tether/harness device. <u>See</u> Engin

---

[4] Contrary to defendant's assertion that the quoted language is within § 7.36.1(d), the exhibit filed and cited by defendant contains the quoted language within § 7.35.1(d) of ANSI-B56.1.  Regardless of the section identifier, however, the language remains uncontested. <u>See</u> Def's. Mem. of Law in Supp. of Summ. J., Dkt. No. 35-4, 21, n.2 (identifying exhibit 21 as the relevant ANSI standard, whereupon the language is located within § 7.35.1(d)).

Dep., Ex. 3B to Def's. Mot. to Strike Pls.' Expert Designation, Dkt. No. 34-7, 144-45.

Defendant's argument that plaintiffs alternative design is necessarily contrary to the adopted

OSHA regulations is therefore weak at best and does not warrant dismissal of plaintiffs'

claims under conflict preemption.

### 6. Inadmissibility of Dr. Engin's Opinions

Defendant also argues that summary judgment is warranted to the extent that Dr.

Engin's opinions are inadmissible.  As already discussed, Dr. Engin will be barred from

testifying that defendant should have designed its orderpicker with an interlock device and

that incorporation of his alternative designs would not have been cost-prohibitive.  Despite

the inadmissibility of these opinions, his remaining admissible opinions raise a genuine issue

of fact as to the allegedly defective design of the orderpicker, namely, whether the applicable

federal standard required a permanently attached safety tether and harness.

Admittedly, Dr. Engin has not tested the feasibility of his design alternatives, but

given the fact that it was possible to attach the safety tether/harness device to the

orderpicker, his lack of testing as to a permanently attached orderpicker does not entitle

defendant to summary judgment.  Rather, as already stated upon consideration of the

admissibility of his opinion, this issue goes to the weight of plaintiffs' alternative design and

may be raised at trial.

## IV. CONCLUSION

Dr. Engin's experience and professional background is sufficient to qualify him as

an expert with respect to the design of defendant's orderpicker.  Although he has relatively

little experience pertaining to orderpickers specifically, his general area of experience

qualifies as specialized knowledge gained through experience, training, and education.

Further disputes as to his background go to the weight of his testimony and may be raised during cross-examination.

Dr. Engin's review of the materials identified in his expert disclosure, taken together with his experience in the field of mechanical engineering and biomechanics, provide him with an independent and reliable basis for his opinions concerning the design of a permanently attached safety tether and harness system and, as an alternative, the incorporation of a segmented guard rail.  Any alleged deficiencies with respect to these opinions under the Daubert factors do not justify their inadmissibility, especially given defendant's admission that the safety tether and harness at issue could have been attached but was packaged within the orderpicker's battery compartment upon delivery.

In contrast, the lack of testing performed by Dr. Engin warrants the inadmissibility of his opinions with respect to the design of an interlock device and his belief that none of his proposed design changes would have been cost prohibitive to defendant.  As illustrated in the previously discussed hypothetical, see supra n.3, the incorporation of an interlock device calls for a much more substantial alternative design than does the construction of a permanently attached safety tether and harness combination.  Moreover, there is no applicable federal safety standard open to his interpretation that calls for the use of an interlock device.  Finally, his approximations of what it may cost to incorporate his design changes are wholly insufficient to serve as a basis for his opinion that none of his design alternatives would have been cost prohibitive.  In particular, even assuming Dr. Engin was aware of the cost of the materials needed to assemble his design alternatives, he has no basis for determining the cost of implementing and installing the designs onto the orderpicker.

Genuine issues of fact exist for all of plaintiffs' claims with exception to the failure to warn claim.  Plaintiffs contest defendant's assertion that the orderpicker was delivered with a safety tether/harness device within the battery compartment, thereby providing a basis for their manufacture defect claim.  Even if the orderpicker was delivered with the required safety equipment, defendant is not entitled to summary judgment of plaintiffs' design defect claim because there is a genuine issue of material fact as to whether defendant should have provided a permanently attached tether and harness.  Removal of the restraint equipment after delivery of the orderpicker did not constitute a substantial modification as the orderpicker was undisputably delivered without the tether and harness attached.  Further, none of the conduct of Mr. Milliman or Primesource was so extraordinary as to constitute unforeseeable misuse as a matter of law because Mr. Milliman was using the orderpicker for its intended use.  Defendant's preemption arguments must also fail because it remains open to determination whether defendant complied with the applicable ANSI standard and none of Dr. Engin's design alternatives would render it impossible for defendant to comply with ANSI-B56.1.

On the other hand, summary judgment in favor of defendant is warranted for plaintiffs' duty to warn and breach of warranty claims.  Falling from the orderpicker's platform without the use of the safety tether and harness was both a risk that Mr. Milliman should have been aware of and a hazard he admits he took into consideration prior to his accident. In light of this decision, Dr. Engin's opinion as to the design of the orderpicker's warning labels are not relevant and will be inadmissible.  Additionally, plaintiffs concede that the statute of limitations has expired for their breach of warranty claim.

Therefore, it is

ORDERED that

1.  Defendant's motion to strike Dr. Engin's expert designation is DENIED.

2.  Defendant's motion to bar Dr. Engin's testimony as to the following opinions is DENIED:

> (1)  instead of a safety tether that could be attached at the election of the operator, the orderpicker should have been designed with a safety tether permanently attached to the overhead platform of the machine;

> (2) the safety harness used with the orderpicker should have been an integral part of the safety tether, i.e., the harness should have been permanently attached to the tether;

> (3) defendant did not design an orderpicker with a fully retractable safety tether;

> (4) as either an alternative or supplement to a permanently attached safety tether and harness restraint system, the orderpicker could have been designed with guardrails around the perimeter of the operator platform which would have prevented Mr. Milliman's fall; and

> (5) because of the distance Mr. Milliman fell, he suffered injuries to parts of his body other than where he impacted the ground.

3.  Defendant's motion to bar Dr. Engin's testimony as to the following opinions is GRANTED:

> (1) there should have been a large, concise, standing alone warning sign on a metallic surface instructing users that the safety tether and harness should be used at all times during operation;

> (2) the orderpicker should have been designed with an interlock device preventing operation without use of the safety tether and harness; and

> (3) incorporation of the proposed design alternatives would not have been cost prohibitive.

4.  Defendant's motion for summary judgment with respect to the following claims is GRANTED and these claims are DISMISSED:

> (1) breach of warranty; and

> (2) breach of the duty to warn against the dangers of using the orderpicker.

5.  Defendant's motion for summary judgment with respect to the following claims is DENIED:

> (1) manufacture and design defects from defendant's negligence;

> (2) strict liability for manufacture and design defects;

> (3) loss of consortium resulting from Mr. Milliman's injuries.

IT IS SO ORDERED.

_____
United States District Judge

Dated: January 28, 2009
      Utica, New York.